## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

PATRICK LEE SMITH, an individual, and    )
PATRICK LEE SMITH and                    )
MISCHA SMITH, as next of friends         )
for P.M.S., a minor child,               )
                                         )
      Plaintiffs,                         )
                                         )
v.                                       )     Case No. CIV-18-808-D
                                         )
COYLE PUBLIC SCHOOLS,                    )
COYLE SCHOOL BOARD OF EDUCATION,         )
JOSH SUMRALL,                            )
CARL WILLIAMS,                           )
TENNY MAKER,                             )
JAY CRENSHAW,                            )
CHAD MAKER, and                          )
JOHN PROSS,                              )
                                         )
      Defendants.                         )

## ORDER

Before the Court is Defendants' Motion for Summary Judgment [Doc. No. 47] and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 52]. Both motions are fully briefed and at issue. *See* Defs.' Resp. Br. [Doc. No. 70], Pls.' Reply Br. [Doc. No. 76], Pls.' Resp. Br. [Doc. No. 81], Defs.' Reply Br. [Doc. No. 85]. The Court has also considered Plaintiffs' Notice of Supplemental Authority [Doc. No. 88].

## BACKGROUND

During a school sponsored trip to attend a Future Farmers of America event in Indianapolis, P.M.S. hit another student in the head after he refused to return her cell phone. This relatively unexceptional incident was followed by a series of events – including the

suspension of P.M.S. from school and the termination of school principal (and P.M.S.'s father) Patrick Smith – that form the basis of the instant lawsuit. Plaintiffs are Patrick Smith, Mischa Smith, and their daughter, P.M.S.[1] They seek declaratory and monetary relief and raise sixteen claims in their Amended Petition,[2] including several constitutional claims brought pursuant to 42 U.S.C. § 1983; claims under Title IX of the Education Amendments of 1972, 20 U.S.C. §§1681, et seq.; claims under The Family Educational Rights and Privacy Act, 20 U.S.C. § 1232f, et seq. ("FERPA"); and claims under state law for tortious conduct, breach of contract, wrongful termination, and violations of the Oklahoma Open Meetings Act, Okla. Stat. tit. 25 §§ 301, et seq. ("OMA") and Oklahoma Open Records Act, Okla. Stat. tit. 51§§ 24A.1, et seq. ("ORA").

Defendants,[3] who include Coyle Public Schools, former Superintendent Josh Sumrall, and the individual members of the school board,[4] move for summary judgment on all claims. Plaintiffs seek partial summary judgment only as to the following: P.M.S.'s

---

[1] P.M.S. was a minor child at the time of the events and the filing of the lawsuit. Mr. Smith sues individually and as next friend of P.M.S. Mrs. Smith sues only as next friend of P.M.S.

[2] Defendants removed the action to federal court pursuant to 28 U.S.C. § 1331 and § 1367. The Amended Petition is the operative pleading.

[3] Although Plaintiff has also named Coyle School Board of Education as a defendant, the school board is not a separate and independent legal entity capable of being sued. *See* Order dated Oct. 28, 2020 [Doc. No. 78] at 5. Further, "where an Oklahoma school district is named as a defendant, any claims against the school board are duplicative of claims against the school district." *Primeaux v. Indep. Sch. Dist. No. 5 of Tulsa Cty. Okla.*, 954 F. Supp. 2d 1292, 1295 (N.D. Okla. 2012).

[4] The individual defendants were sued in their individual and official capacity. The official capacity suits are, however, simply another way of pleading a claim against the entity they represent, Coyle Public Schools. *See Douglas v. Beaver Cty. Sch. Dist. Bd.*, 82 F. App'x 200, 203 (10th Cir. 2003) (unpublished); *Bertot v. Sch. Dist. No. 1, Albany Cty., Wyo.*, 613 F.2d 245, 247 n. 1 (10th Cir. 1979).

claims under the First Amendment, Title IX, Procedural Due Process Clause, and Equal Protection Clause; Mr. Smith's claims under the First Amendment and the Equal Protection Clause; and their state law claims under the OMA and ORA.

## STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the facts and evidence are such that a reasonable juror could return a verdict for either party. *Id.* All facts and reasonable inferences must be viewed in the light most favorable to the nonmovant. *Id.*

A movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998); FED. R. CIV. P. 56(c)(1)(A). Ultimately, the Court's inquiry is whether the facts and evidence of record present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard, with each motion viewed in the light most favorable to its nonmoving party." *Banner Bank v. First Am. Title Ins. Co*., 916 F.3d 1323, 1326 (10th Cir. 2019). When the parties file cross motions for summary judgment, the Court is entitled to assume "'no evidence needs to be considered other than that filed by the parties.'" *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000) (citation omitted).

## UNDISPUTED FACTS

At the time of the events at issue in this case, Patrick Smith was the principal of Coyle Public Schools ("CPS") and Josh Sumrall was the school district's superintendent. Mr. Smith's daughter, P.M.S., and Mr. Sumrall's step-son, K.S., were high school students at CPS. In October of 2017, P.M.S., K.S., and several other CPS students traveled to a Future Farmers of America convention in Indianapolis. A CPS teacher and a parent chaperone also attended the trip. While riding in the school suburban on the way to a hotel, P.M.S. received a phone call. Another student answered the call, then passed the phone to the parent chaperone. After speaking to the caller, the parent chaperone handed the phone to K.S. to return to P.M.S. K.S. would not return the phone, so P.M.S. hit K.S. on the side of his head with her open hand. K.S. then threw the phone on the floor. Defs.' Mot. at ¶ 5; Pls.' Mot. at ¶¶ 10-11.

After retrieving the phone and while still in the suburban, P.M.S. engaged in a group text message conversation with some friends in which she sent the following:

IMMA KILL [K.S.] AND HOS MONOTONE VOICE
                                    ***
I'm gonna f***ing decapitate him. I've been nice this entire f***ing trip
and when I ask for my f***ing phone politiely I want my f***ing phone.
I wish I woulda hit him harder.

Defs.' Mot. at ¶ 9; Pls. Mot. at ¶ 12.

The parent chaperone on the trip eventually told K.S.'s mother about the hitting incident, who reported it to Mr. Sumrall. Mr. Sumrall then went to the Smith's residence after hours and complained that there were "big problems" on the trip. Defs. Mot. at ¶4; Pls. Mot. at ¶ 14. Mr. Smith called P.M.S., who admitted to hitting K.S. Defs. Mot. at ¶ 5. Mr. Smith determined that a three day out of school suspension was appropriate disciplinary action because that is standard when physical contact occurs. Pls. Mot. at ¶ 16. Although other students engaged in "horseplay" or made inappropriate gestures while on the FFA trip, no other student was disciplined. Pls. Mot. at ¶ 17.

By the Monday following the trip, Mr. Sumrall had also learned of the text messages P.M.S. sent to her friends. Apparently, the parent chaperone, whose child was included in the group text conversation, obtained the messages and then showed them to Mr. Sumrall's wife. *Id.* at ¶ 19. Neither Mr. Smith nor Mr. Sumrall felt that the messages were a genuine threat. After speaking with the teacher who attended the FFA trip and having several conversations with Mr. Sumrall, Mr. Smith issued two separate disciplinary referrals for P.M.S.: a three-day suspension for hitting and a three-day suspension for sending threatening text messages. *See* Ex. 7 to Dfs. Mot. Another student who was involved in the group text conversation was similarly disciplined. Defs. Mot. at ¶ 14. Mr. Smith testified that he did not agree that P.M.S. should have received a disciplinary referral for the text

messages. Defs. Mot. at ¶ 10; Pls. Mot. at ¶ 22. Mr. Sumrall also contacted the Langston Police Department to report the hitting incident and the text messages. *Id.* at ¶ 11; Pls. Mot. at ¶ 28. A police report was generated but no charges were filed. Defs. Mot. at ¶ 11; Pls. Mot. at ¶ 31.

P.M.S. served the suspension for hitting and returned to school. Mrs. Smith appealed the suspension related to the text messages on behalf of P.M.S. CPS scheduled the appeal hearing for the November 13, 2017 school board meeting. The school board convened the meeting as planned on that date but decided to relocate the meeting to the school cafeteria in order to accommodate the large number of people in attendance. While in transit to the school cafeteria, Board President Carl Williams, Mr. Sumrall, and an attorney for the school had a private discussion. After arriving in the cafeteria, the school's attorney publicly announced that all disciplinary action against P.M.S. was withdrawn. Mr. Sumrall testified that he made the decision to withdraw the suspension. Because the suspension was withdrawn, the appeal hearing was not held. P.M.S. never served a suspension related to the text messages and the discipline was removed from her record.[5] Defs. Mot. at ¶¶ 18-19; Pls. Mot. at ¶¶ 38-41; Defs. Ex. 2 at p. 92. The Smiths continued to request a hearing in front of the school board to clear P.M.S.'s name and they were permitted to address the school board at a public meeting on December 11, 2017. Defs. Mot. at ¶ 21.

The professional relationship between Mr. Smith and Mr. Sumrall deteriorated as a result of the incident. At some point, Mr. Sumrall and Mr. Smith had a conversation as to

---

[5] Plaintiffs' contention to the contrary is incorrect. The disciplinary record that they cite relates to the suspension for hitting, not the suspension for threatening text messages.

whether they could continue working together. During this conversation, Mr. Sumrall suggested he could look into buying out Mr. Smith's contract. Defs. Resp. at ¶63; Pls. Mot. at ¶¶ 63-64.

On November 29, 2017, Mr. Sumrall received a letter from a teacher at CPS indicating that she had never received a copy of her annual teacher evaluation.[6] Defs' Mot. at ¶ 28. Pursuant to district policy and state law, teachers must be evaluated annually by a person certified to perform the reviews. *Id.* at ¶ 34; Okla. Stat. Ann. tit. 70, § 6-101.10. After receiving the letter, Mr. Sumrall checked the school's electronic database to determine whether any teacher evaluations had been completed for the year. The records indicated that Mr. Smith had not completed any evaluations but that Jill Ritter, a reading specialist and assistant principal for at least part of the 2017-2018 school year, had completed three or four teacher evaluations. *Id.* at ¶ 29. On December 5, 2017, Mr. Sumrall called Mr. Smith in for a meeting. Ms. Ritter was also present. At the meeting, Mr. Sumrall asked Mr. Smith if he had completed any teacher evaluations during the current school year. Mr. Smith responded that he had completed some. Mr. Sumrall asked Mr. Smith to produce them immediately and Mr. Smith said he would not. Mr. Sumrall then informed Mr. Smith that his employment would be terminated. *Id.* at ¶ 30.

---

[6] Plaintiffs do not dispute this fact but argue the statements in the letter are inadmissible hearsay. The statements are used to show their effect on the recipient, Mr. Sumrall, and not for the truth of the matter asserted, and no challenge to authenticity is advanced. Accordingly, they are not hearsay, and are presented in a form that could be admissible at trial.

Mr. Sumrall subsequently sent Mr. Smith a written letter detailing his infractions, informing him he was suspended with pay, and advising him of his right to a hearing. Following Mr. Smith's request, a due process hearing with the school board was scheduled for January 25, 2018. Defs. Mot. at ¶¶ 31-32. Mr. Smith was represented by an attorney at the hearing and had an opportunity to present evidence and cross-examine witnesses. *Id.* at ¶ 33. The administration presented evidence that several teachers had never been evaluated by Mr. Smith and others had not been evaluated for the last two years. The administration also presented evidence that Mr. Smith submitted information during the school accreditation process that falsely indicated he had completed certain evaluations. At the conclusion of the hearing, the school board adopted written findings of fact that had been prepared in advance. The findings of fact state that Mr. Smith admitted he did not perform the teacher evaluations, made a false statement, and submitted false information during the school accreditation process. The written findings also state that the disagreement between Mr. Sumrall and Mr. Smith regarding P.M.S.'s discipline does not excuse Mr. Smith's conduct. The school board voted unanimously to terminate Mr. Smith's employment. *Id.* at ¶ 33-41. Mr. Smith does not dispute these facts but asserts that he believed the written evaluations were not as important as having an ongoing rapport with teachers. Pls. Resp. at ¶¶ 30-39.

Mr. Smith obtained a position as high school and middle school principal at Hominy School District in July of 2018. *Id.* at ¶ 42. P.M.S. completed her junior year at CPS and then enrolled at a new high school. *Id.* at ¶ 23. CPS was not penalized for failing to complete the teacher evaluations. Pls. Mot. at ¶ 82. The principal who replaced Mr. Sumrall failed

the test required to become a certified evaluator, so CPS hired a contractor to complete the evaluations. *Id.* at ¶¶ 83-84.

## DISCUSSION

### I.  Title IX Claim

Title IX of the Education Amendments of 1972 provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance… .

20 U.S.C.A. § 1681(a). To state a claim under Title IX, "a plaintiff must show: (1) that he or she was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that the exclusion from the program was on the basis of sex." *Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996). Additionally, courts must "apply the familiar *McDonnell Douglas* burden-shifting framework when assessing a motion for summary judgment on a claim of sex discrimination." *Throupe v. Univ. of Denver*, 988 F.3d 1243, 1251 (10th Cir. 2021); *see also Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021). Under this framework,

> the plaintiff has the burden of presenting a prima facie case of discrimination. [] The burden then moves to the employer to articulate a legitimate, non-discriminatory reason for its actions. [] Summary judgment will be granted if the plaintiff cannot prove the employer's articulated reasons are pretextual.

*Throupe*, 988 F.3d at 1251 (internal citation omitted).

9

Here, Plaintiffs plead two possible grounds for relief under Title IX: first, that CPS unlawfully discriminated against P.M.S. based on her sex when she was disciplined and second, that CPS failed to protect her from sexual harassment. As to the first ground, the Tenth circuit recognizes that "Title IX 'bars the imposition of university discipline where [sex] is a motivating factor in the decision to discipline.'" *Doe*, 1 F.4th at 829 (quoting *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994)) (alteration in original). Although other circuits have relied on specific analytical tests to evaluate Title IX discipline cases, the Tenth Circuit simply asks "[c]ould a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the [school's] disciplinary decision?" *Id.* at 830. Even when construing the facts in the light most favorable to Plaintiffs, the Court must answer that question in the negative.

To support their claim that P.M.S. was disciplined more harshly because of her sex, Plaintiffs identify several CPS school disciplinary records where other female students with no prior misconduct reports were disciplined less harshly than P.M.S. Although these records may show that CPS issues discipline in an inconsistent manner, they do not show that P.M.S. was discriminated against because of her sex. To draw that inference, Plaintiff would need to identify a similarly situated male student who was treated less harshly than P.M.S. *See Doe*, 1 F.4[th] at 830 (explaining that evidence of selective enforcement, which requires a plaintiff to show that a similarly-situated member of the opposite sex was treated more favorably, could show sex discrimination under Title IX). But Plaintiffs do not identify any CPS disciplinary records showing that male students who engaged in similar

conduct were treated more favorably.[7] Instead, Plaintiffs rely on the fact that none of the male students who attended the FFA trip with P.M.S. were disciplined. This too is insufficient because the misconduct these male students engaged in – refusing to return a student's cell phone, physical horseplay, and making an obscene gesture at a parent – is materially different from the misconduct attributed to P.M.S. *See Johnson v. W. State Colorado Univ.,* 71 F. Supp. 3d 1217, 1224 (D. Colo. 2014) (requiring plaintiff and comparator to "be similarly situated 'in all material respects.'"). Based on the undisputed facts, no reasonable jury could conclude that P.M.S.'s sex was a motivating factor in the disciplinary decision.

Plaintiffs additionally argue that Defendants violated Title IX by failing to act on P.M.S.'s reports of persistent harassment towards her by K.S. A school district can be liable for peer-to-peer sexual harassment under Title IX "only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999). "Damages are not available for simple acts of teasing and name-calling among school children…even where these comments target differences in gender." *Id.* at 652.

---

[7] In fact, the CPS records attached to Plaintiffs' brief show that at least some male students were given the same punishment as P.M.S. for hitting others or fighting. *See* Doc. 56-33 at 1124, 1139, 1145, 1163, 1179. At least some male students were also issued suspensions for making threatening comments or using inappropriate language. *Id.* at 1121. The similar treatment between P.M.S. and these male students fatally undercuts her claim that sex was a motivating factor in CPS's disciplinary decision. Further, Mr. Smith admitted that three days is a standard punishment when physical contact occurs. Pls. Mot. at ¶ 16.

Here, Plaintiffs have no evidence that P.M.S. was subject to sexual harassment, let alone sexual harassment that was so severe it amounted to a denial of educational benefits. In her deposition, P.M.S. stated that K.S. annoyed her but he never said anything to her about her gender. She further described her interactions with K.S. prior to the FFA trip as "simple issues, little annoyances" and "nothing that was major." Mr. Smith, as school principal, agreed that this behavior, although annoying, did not "elevate to the point where it would have been a disciplinary action." Following the FFA trip, her only complaint was that he scoffed or laughed when she made comments during an FFA officer meeting, but that otherwise they "did not talk" and "did not make eye contact." *See* Ex. 1 and Ex. 4 to Defs. Mot. These facts fall far short of demonstrating peer-to-peer sexual harassment which would subject CPS to liability under Title IX. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' Title IX claims.

## II.  FERPA Claim

Although Plaintiffs asserted a claim for what they perceived to be various violations of FERPA, they now concede that their claim is not viable because FERPA does not provide a private cause of action for the wrongful disclosure of education records. *Gonzaga Univ. v. Doe*, 536 U.S. 273, 276 (2002). Defendants are therefore entitled to summary judgment on Plaintiffs' FERPA claim.

### III.  First Amendment Claims

#### A.  Claims brought by P.M.S.

P.M.S asserts that Defendants violated her First Amendment rights in a number of ways,[8] but her principal complaint is that Mr. Sumrall violated her right to engage in free speech when he disciplined her for the text messages. The Supreme Court has made clear that "[m]inors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (internal quotation marks and citation omitted). While public schools may regulate student speech in certain situations, students nevertheless enjoy robust First Amendment rights. *See Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, ___ U.S. ___, 141 S. Ct. 2038 (2021); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503 (1969). This is particularly true when the speech occurs off campus or via a personal cell phone to a private audience. *Mahoney*, 141 S. Ct. at 2047.

The challenge for P.M.S., however, is that she was neither prevented from speaking nor retaliated against in a manner that would chill her future speech. To assess a claim of retaliation against a non-employer for exercising one's freedom of speech, a plaintiff must show that "the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity." *Smith v. Plati*, 258

---

[8] The Amended Petition also provides that P.M.S's First Amendment rights were violated because she was denied the opportunity to address the school board, her school records related to the second suspension were not expunged, and Defendants failed to "resolve" the police report. None of these assertions has merit. First, P.M.S. and her parents were given an opportunity to address the school board at a public meeting on December 11, 2017. Second, the withdrawn suspension for the text message was expunged from her school records. Third, it is entirely unclear how Defendants' failure to further address the police report violates P.M.S.'s First Amendment rights.

F.3d 1167, 1176 (10th Cir. 2001). Although a disciplinary referral was initially issued for her text messages, it was subsequently withdrawn by the administration. Thus, she did not serve a suspension or receive any other punishment related to her speech. Plaintiffs have not put forward any evidence that P.M.S. harbored subjective concerns about her ability to engage in future speech and, more importantly, a person of ordinary firmness would not be deterred from speaking when no punishment was imposed. *See id*. at 1177 n. 9 (dismissing First Amendment retaliation claim where plaintiff alleged only attempts, threats, and preliminary actions but not "concrete, retaliatory action"); *Hicks v. City of Watonga, Okl*., 942 F.2d 737, 743 (10th Cir. 1991) (finding no chilling effect where defendants did not act on threat to fire plaintiff's girlfriend). Because P.M.S. was not punished for engaging in protected speech,  Defendants are entitled to summary judgment on her First Amendment claims.

### B.  Claims brought by Mr. Smith

Mr. Smith asserts that his First Amendment rights were violated when Mr. Sumrall and the Board terminated his employment with CPS in retaliation for his speech regarding P.M.S.'s discipline. The *Garcetti/Pickering* analysis governs claims of retaliatory discharge of a public employee in violation of the First Amendment. This analysis involves five elements:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have

reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009). Defendants do not dispute the first three elements, but argue that they are entitled to summary judgment on the fourth and fifth element. Mr. Smith contends that the timeline of events at least creates a factual dispute as to whether his speech was a motivating factor in the termination. However, even assuming he can generate a factual dispute on the fourth element, his claim fails on the fifth element.

Under this final element, "if the employee establishes that his or her protected speech was a motivating factor in the adverse employment decision, 'the burden then shifts to the defendant, who must show by a preponderance of the evidence it would have reached the same employment decision in the absence of the protected activity.'" *Trant v. Oklahoma*, 754 F.3d 1158, 1167 (10th Cir. 2014) (quoting *Cragg v. City of Osawatomie*, 143 F.3d 1343, 1346 (10th Cir.1998)). Although this element is typically resolved by the trier of fact, "[s]ummary judgment is appropriate on the fifth step when 'any reasonable jury would [have found] that [the plaintiff] would have been terminated even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech." *Id.* (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 117 (2d Cir.2011) (alterations in *Trant*).

For example, in *Trant*, 754 F.3d at 1165, the former chief medical examiner argued that the Board of Medicolegal Investigations terminated him in retaliation for his statements threatening to reveal information related to a grand jury investigation. The

Tenth Circuit found that the Board was justified in firing Trant based on allegations of sexual harassment and insubordination and rejected his argument that these reasons were mere pretext. *Id.* at 1168. The Tenth Circuit concluded that Trant could not succeed on his claim "[b]ecause 'the lawful reason alone would have sufficed to justify the firing.'" *Id.* (citation omitted).

Here, Mr. Smith was terminated by the school board, not by Mr. Sumrall. The school board unanimously voted to dismiss Mr. Smith after holding a hearing where he essentially admitted to failing to complete the required evaluations and then lying about it. Like in *Trant*, the school board was justified in terminating Mr. Smith for this misconduct alone. In other words, "the reasons the Board offered [are] sufficient to show that any retaliatory motive was not the but-for cause of [Mr. Smith's] termination." *Id.* Importantly, whatever petty or vindictive motives one may be able to attribute to Mr. Sumrall, Plaintiff has no admissible evidence that the board members acted out of retaliation or that they would have voted differently had Mr. Smith not challenged P.M.S.'s discipline.

In attempting to create a question of fact on this issue, Mr. Smith points out that the school board did not terminate Ms. Ritter, another administrator who failed to complete some of the evaluations. This argument is unpersuasive, however, because Ms. Ritter did not engage in the same misconduct. Unlike Mr. Smith, she had completed at least some of the evaluations part way through the year, and, most importantly, she did not lie about her actions. Defendants have met their burden of coming forward with evidence sufficiently showing that the termination would have taken place regardless of the protected speech, and that any reasonable jury would find Mr. Smith would have been terminated even absent

some retaliatory motive. Defendants are, therefore, entitled to summary judgment on Mr. Smith's First Amendment claim.

## IV. Fourteenth Amendment Due Process Claims

### A. Claims brought on behalf of P.M.S.

#### 1. Property Interest Claims

P.M.S. asserts that Defendants deprived her of a protected property interest without due process of law in violation of the Fourteenth Amendment when they refused to consider whether her behavior warranted discipline and provide her a fair hearing. She alleges that this claim is brought under both the substantive and procedural components of the Due Process Clause.

To start, P.M.S.'s substantive due process claim has no merit. To prevail on a substantive due process claim, a plaintiff "must demonstrate that the state acted in a manner that 'shock[s] the conscience.'" *Uhlrig v. Harder*, 64 F.3d 567, 571 (10th Cir. 1995) (internal citation omitted). To satisfy this standard, "a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Id*. at 574. Instead, "the plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Id*. at 574. "[O]nly the most egregious official conduct" meets this standard. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). The conduct P.M.S. takes issue with includes CPS's failure to follow its own disciplinary procedures and an alleged violation of the Oklahoma Open Meetings Act. This is simply not the type of conduct that "can properly be characterized as arbitrary, or conscience shocking, in a

constitutional sense." *Collins, v. City of Harker Heights, Tex.*, 503 U.S. 115, 128 (1992).

P.M.S.'s procedural due process claim asserts a number of complaints but they too fail to survive summary judgment. A procedural due process claim requires a plaintiff to "prove two elements: that he possessed a constitutionally protected liberty or property 'interest such that the due process protections were applicable,' and that he was not 'afforded an appropriate level of process.'" *Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1256 (10th Cir. 2008) (citations omitted). The parties do not dispute that a student has a constitutionally protected property interest in a public education, but they do disagree as to whether P.M.S. was unfairly deprived of this interest.

In *Goss v. Lopez*, 419 U.S. 565, 581 (1975), the Supreme Court detailed the minimum due process protections a student is entitled to in connection with a suspension of 10 days or less: "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." The Supreme Court further explained that

> [t]here need be no delay between the time 'notice' is given and the time of the hearing. In the great majority of cases the disciplinarian may informally discuss the alleged misconduct with the student minutes after it has occurred. We hold only that, in being given an opportunity to explain his version of the facts at this discussion, the student first be told what he is accused of doing and what the basis of the accusation is.

*Id.* at 582. Further, the Tenth Circuit has interpreted *Goss* narrowly and held that "the innumerable separate components of the educational process, such as participation in athletics and membership in school clubs, do not create a property interest subject to constitutional protection." *Seamons v. Snow*, 84 F.3d 1226, 1235 (10th Cir. 1996).

P.M.S. appears to be complaining that her procedural due process rights were violated in connection with both the initial three-day suspension for hitting and the revoked three-day suspension for inappropriate text messages. As to the initial suspension, the undisputed facts establish that Mr. Smith, as the principal of the school, had the authority to discipline P.M.S. for hitting another student. The facts also establish that Mr. Smith contacted P.M.S. prior to issuing any discipline and gave her an opportunity to explain her side of the story. This procedure satisfies the requirements outlined in *Goss* and the fact that the discussion was informal or that the principal also happens to be the student's parent is of no moment.

P.M.S.'s due process claim also fails for another reason. To make out a due process violation, "a student must show substantial prejudice from the allegedly inadequate procedure." *Watson ex rel. Watson v. Beckel*, 242 F.3d 1237, 1242 (10th Cir. 2001). Substantial prejudice does not exist where a student admits guilt or otherwise fails to deny the charges. *Id.*; *see also Brown v. Univ. of Kansas*, 599 F. App'x 833, 837 (10th Cir. 2015)(unpublished). Here, P.M.S. admitted to hitting K.S., and she cannot therefore complain that the discipline imposed on her, which Mr. Smith characterized as a standard punishment, violated her due process rights.

To the extent P.M.S. argues that her due process rights were violated in connection with the disciplinary referral for the text messages, the Court has already determined that "Plaintiffs have not articulated a theory under which Sumrall's withdrawal of the suspension implicates a liberty or property interest of P.M.S." because the suspension was

rescinded before it was served. *See* Order dated Oct. 28, 2020, Doc. 78 at 8. Nothing in the Plaintiffs' arguments persuades the Court that it should revisit this conclusion.

P.M.S. makes several additional arguments in an attempt to rescue her due process claim. First, she asserts that Mr. Sumrall, who was involved in the disciplinary process, was a biased decision maker because his step-son was part of the incident. This may be so, but Mr. Smith testified that he decided on the initial three-day suspension prior to any subsequent meeting with Mr. Sumrall. *See* Pls. Mot. at ¶ 16. This testimony undercuts any allegation that P.M.S. was denied a fair proceeding due to a biased decisionmaker. Second, P.M.S. argues that her due process rights were violated because CPS failed to follow their own disciplinary procedures, which require written notice and a hearing with the superintendent. Of course, "a school's failure to comply with its own rules 'does not, in itself, constitute a violation of the Fourteenth Amendment.'" *Brown*, 599 F. App'x at 838 (citation omitted). Last, P.M.S. asserts that she was denied a hearing in which she could "clear her name." P.M.S. admitted the charges relied on for the first suspension and had no need of hearing for the second suspension because the charges were revoked. However, to the extent she wanted to publicly tell her side of the story, she addressed the school board on December 11, 2017.

In sum, the procedures afforded to P.M.S. were fair as a matter of law and Defendants are entitled to summary judgment on her property interest claim.

### 2.    Liberty Interest Claim

P.M.S. also asserts that she was deprived of a protected liberty interest because she suffered damage to her reputation and lost certain educational opportunities as a result of

transferring to a new school for her senior year. The Tenth Circuit addressed similar claims in *Seamons*, 84 F.3d at 1235. There, the plaintiff alleged his high school's response to his report of an assault involving the football team was harassing and discriminatory. *Id.* at 1230. After being dismissed from the football team and subjected to a hostile environment, he transferred to another school. *Id.* In his lawsuit against the school, the plaintiff brought a due process claim alleging that the defendant's conduct damaged his reputation in the community and that the transfer caused him to lose access to certain extracurricular activities and advanced classes. *Id.* at 1235.

The Tenth Circuit rejected these arguments. First, the Tenth Circuit held that the plaintiff could not state a claim because the decision to transfer schools was made by the plaintiff and did not involve deliberate action on the part of the school. *Id.* at 1234. Next, the Tenth Circuit explained that the plaintiff did not have "a protectible property or liberty interest under the Due Process Clause" to incidents of education, such as the right to take specific classes or even attend a particular school, and that "damage to an individual's reputation alone, apart from some more tangible interest, is not enough to establish a due process violation." *Id.* at 1235.

Like the plaintiff in *Seamons*, P.M.S. cannot succeed on her claim because the educational opportunities she allegedly lost – potential scholarships, a school-based internship, and extracurricular leadership positions – are not protectible liberty interests. Further, the lost opportunities resulted from her voluntary decision to transfer schools. Granted, the transfer occurred after Mr. Smith was terminated and had to find employment in a different school district, but it was still a voluntary decision. Similar to *Seamons*,

Defendants did not expel her or take some other deliberate action to prevent P.M.S. from continuing to attend CPS. Finally, mere damage to her reputation that may have resulted from Defendants' actions is insufficient to show that she was deprived of a liberty interest. Accordingly, Defendants are entitled to summary judgment on P.M.S.'s liberty interest claim.

### B.  Claims brought by Mr. Smith

#### 1.      Property Interest Claims

Mr. Smith asserts that he was deprived of property without due process of law when Defendants suspended him from his position as principal. Like P.M.S., he purports to bring this claim under both the procedural and substantive components of the Due Process Clause. As previously explained, a plaintiff must allege behavior that "shocks the conscience" to succeed on a substantive due process claim. *Uhlrig*, 64 F.3d at 571.  Mr. Smith's contention that he was suspended with full pay and benefits pending the outcome of a pre-termination hearing falls far short of this mark.

To succeed on his procedural due process claim, Mr. Smith must show that he has a protectible property interest. *Brammer-Hoelter,* 492 F.3d at 1209. Courts must "look to state law to determine whether a property interest in employment exists." *Id.* Oklahoma law provides that the administration of a school district may suspend an administrator without notice or hearing if it has reason to believe that cause exists for the dismissal and so long as the administrator is not deprived of any compensation or benefits. Okla. Stat. Ann. tit. 70, § 6-101.14. As Mr. Smith's suspension did not terminate his pay or other benefits, he has not shown that he was deprived of any protected property interest. Further,

the Tenth Circuit has held that "suspension with pay does not raise due process concerns."

*Hicks*, 942 F.2d at 746 n. 4.

Although his Amended Petition only complained of his suspension, Mr. Smith's Response brief also argues that his due process rights were violated because the tribunal that presided over his hearing was biased. When evaluating a claim of bias on the part of an administrative tribunal, the Tenth Circuit has explained that

> [d]ue process is violated only when 'the risk of unfairness is intolerably high' under the circumstances of a particular case.... Because honesty and integrity are presumed on the part of a tribunal…there must be some substantial countervailing reason to conclude that a decisionmaker is actually biased with respect to factual issues being adjudicated[.]

*Mangels v. Pena*, 789 F.2d 836, 838 (10th Cir. 1986) (internal citation omitted). Further, a decisionmaker will not be disqualified "simply because he has taken a position, even in public, on a policy issue related to the dispute, in the absence of a showing that he is not 'capable of judging a particular controversy fairly on the basis of its own circumstances.'" *Hortonville Joint Sch. Dist. No. 1 v. Hortonville Educ. Ass'n,* 426 U.S. 482, 493 (1976) (citation omitted).

In attempting to create a factual dispute about the impartiality of the school board members that voted on his termination, Mr. Smith takes a number of ill-fated approaches. He first argues that the school board would take any action Mr. Sumrall recommended. This assertion is supported by speculation and opinion testimony, not facts, and is not sufficient to defeat a properly supported motion for summary judgment. *Cypert v. Indep. Sch. Dist. No. I-050 of Osage Cty.*, 661 F.3d 477, 481 (10th Cir. 2011) (discounting

testimony that board members were biased because it was based on opinion and speculation). Mr. Smith next argues that "key information" was intentionally withheld from the school board. The problem with this argument is that Mr. Smith does not explain why he did not present this key information to the school board himself at the due process hearing or how the absence of that information affected the impartiality of the tribunal. Mr. Smith then grossly mischaracterizes an inquiry Mr. Sumrall made to the local police department and speculates that it was done to "place suspicion in the minds of the board members." But again, Mr. Smith fails to explain how this information rendered any board member biased against him, or that Mr. Sumrall ever told any board member about the inquiry.

Mr. Smith's next argument is that the tribunal was biased because Mr. Sumrall announced Mr. Smith's termination at a staff meeting a month before the hearing. While this may be evidence that Mr. Sumrall believed the termination was inevitable, it does not show that the school board members – the people voting on the termination – had made up their minds in advance. Along these same lines, Mr. Smith complains that the tribunal was biased because it appears that the findings of fact adopted at the hearing were written prior to the hearing. As support for this contention, Mr. Smith cites to the meeting minutes and agenda and the findings of fact themselves. He does not identify when the findings of fact were written or identify who wrote them. Mr. Smith relies on *Patrick v. Miller*, 953 F.2d 1240, 1245 (10th Cir. 1992), in arguing that these pre-written findings are sufficient to create a fact question as to the tribunal's bias. But the allegations of bias in *Patrick* were much stronger than the evidence Mr. Smith presents here. In *Patrick*, the Tenth Circuit

24

denied qualified immunity where there was evidence that the hearing officer was given a prepared memorandum finding the employee should be terminated in advance, and the hearing officer felt "coerced" into approving the termination although he disagreed with it. Mr. Smith has not come forward with any evidence showing that the board members felt coerced or pressured to reach a result with which they did not agree.

In the end, none of the evidence Mr. Smith presents is sufficient to overcome the presumption that the school board members who voted on his termination acted with honesty and integrity. *Mangels*, 789 F.2d at 838. There is no evidence that the board members were actually biased against Mr. Smith or could not impartially resolve the factual issues presented. Based on the undisputed facts, no reasonable juror could find the risk of unfairness was intolerably high, and Defendants are therefore entitled to summary judgment on Mr. Smith's property interest claim.

## 2.      Liberty Interest Claim

Mr. Smith also asserts that Defendants deprived him of a liberty interest by suspending him, terminating him, damaging his reputation and interfering with his future employment pursuits. To succeed on his claim, Mr. Smith must show that he was deprived of a protected liberty interest without due process. *Brammer-Hoelter*, 492 F.3d at 1209. As previously explained, neither damage to reputation nor a suspension with pay raise due process concerns. *Hicks,* 942 F.2d at 746 n. 4; *Seamons*, 84 F.3d at 1235.  Further, the undisputed facts show that Mr. Smith received notice and a hearing prior to his termination

and was therefore not deprived of any protectible interest without due process.[9] Defendants are entitled to summary judgment on Mr. Smith's liberty interest claim.

## V.    Right of Privacy Claim

Plaintiffs' final federal law claim alleges that Defendants intentionally disclosed confidential information, such as P.M.S.'s educational records, in violation of the Fourteenth Amendment. However, in their Response brief, Plaintiffs point to no evidence that any educational records were disclosed and instead focus exclusively on arguing that Mr. Sumrall's reporting of the text messages to the local police department, which generated a police report, violates their "privacy rights." Plaintiffs make no effort to define the legal contours of their privacy rights, explain why P.M.S. might have had a legitimate expectation of privacy in the text messages, or explain how an individual's reporting of factual information to a police department violates their privacy. Indeed, they do not cite a single legal source in defending this claim. As a result, Plaintiffs have not met their burden to show that P.M.S. had a constitutional right of privacy in the information disclosed and this failure alone is enough to grant summary judgment to Defendants. *See Gallo Loecks ex rel. T.L. v. Reynolds*, 34 F. App'x 644, 649 (10th Cir. 2002) (unpublished) (affirming grant of summary judgment to defendants on constitutional privacy claim where plaintiff made no effort to establish a legitimate expectation of confidentiality).

In any event, neither the facts nor the law are on Plaintiffs' side in this situation. In *Leiser v. Moore*, 903 F.3d 1137, 1144 (10th Cir. 2018), the Tenth Circuit recognized that

---

[9] Tellingly, Plaintiffs' Response brief failed to address Defendants' argument that Mr. Smith was afforded due process prior to any deprivation.

the Supreme Court "has never held that there is a constitutional right to prevent government disclosure of private information." Although the Tenth Circuit previously recognized a constitutional right of privacy in information that a person legitimately expects to remain confidential, such as medical history, financial information, or private spousal communications, *see Sheets v. Salt Lake Cty.*, 45 F.3d 1383, 1388 (10th Cir. 1995), *Leiser* clarified that "disclosures are prohibited only when they shock the conscience." *Leiser*, 903 F.3d at 1144.

Here, Plaintiffs are not alleging that their medical history or financial records were improperly released to the public. Instead, they are complaining that Mr. Sumrall told a police officer about the incident on the FAA trip and the text messages P.M.S. sent to her friends (which were passed to Mr. Sumrall from another parent). This is not the sort of highly personal information that one would legitimately expect to remain confidential nor does its disclosure to a police officer shock the conscience. *See Glenn v. Davis Sch. Dist.,* No. 1:19-CV-00008-DAK, 2019 WL 5423728, at *8 (D. Utah Oct. 23, 2019) (dismissing privacy claim where school disclosed student's health conditions to parent's employer). Further, to the extent Plaintiffs complain about the police report being a publicly available record – a fact the Defendants dispute – that does not make out a constitutional violation. *See Nilson v. Layton City*, 45 F.3d 369, 372 (10th Cir. 1995) (finding that "government disclosures of arrest records…and information contained in police reports…do not implicate the right to privacy."). Defendants are entitled to summary judgment on Plaintiff's privacy claim.

## VI.    Pendent State Law Claims

Having disposed of Plaintiffs' federal claims, the only issues that remain are matters of state law. "'A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary.'" *Apache Tribe of Oklahoma v. Brown*, 966 F. Supp. 2d 1188, 1197–98 (W.D. Okla. 2013) (quoting *Carlsbad Technology, Inc. v. HIF Bio, Inc*., 556 U.S. 635, 639–40 (2009)). The Tenth Circuit instructs that "[w]hen all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state law claims." *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (quotation and citation omitted). Indeed, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988).

Here, the Court finds that it is appropriate to decline to exercise its jurisdiction over Plaintiffs' state law claims. The Court is cognizant of the length of time the case has been pending and that the parties have engaged in extensive discovery. However, no trial submissions have been made and the case is not currently set on any trial docket. Under the circumstances of this case, the Court finds Plaintiffs' state law claims should be remanded to the state court in which the action was filed.

## CONCLUSION

For the reasons stated above, the Court finds that Defendants are entitled to summary judgment on all claims brought pursuant to Title IX, FERPA, and 42 U.S.C. § 1983 and that Plaintiffs' remaining state claims should be remanded to state court.

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment [Doc No. 47] is **GRANTED** in part and Plaintiffs' Motion for Partial Summary Judgment [Doc. No. 56] is **DENIED** in part as set forth herein.

IT IS FURTHER ORDERED that the remainder of Plaintiffs' action, asserting purely state law claims, is remanded to the District Court of Logan County, Oklahoma, case number CJ-2018-93.

**IT IS SO ORDERED** this 10th day of September, 2021.

 

 

TIMOTHY D. DeGIUSTI
Chief United States District Judge